1
2
3
4
5
6
7

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LONNIE D. ROBINSON,

11          Petitioner,                2: 10 - cv - 1391 - JAM TJB

12     vs.

13   R. LOPEZ,

14          Respondent.            ORDER, FINDINGS AND

15                                 RECOMMENDATIONS

16   _____/

17                      I.  INTRODUCTION

18          Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of 105 years to

20   life after being convicted of three counts of robbery in the second degree.  The jury also found

21   true that Petitioner had previously been convicted of five felony counts of robbery.  Petitioner

22   raises three claims in this federal habeas petition; specifically:  (1) due process violations due to

23   an impermissibly suggestive field identification ("Claim I"); (2) trial court error in denying

24   motion to sever ("Claim II"); and (3) prosecutorial misconduct ("Claim III").  For the following

25   reasons, the habeas petition should be denied.

26

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Madeline Thompson was working at cash register four at the Rite Aid on Freeport Boulevard near City College about 9:00 p.m. on April 7, 2003.  Defendant walked into the store.  She recognized him, he had robbed the store before, and from his demeanor she knew he was going to do so again.  As he approached the register she said she would be right with him and began to walk away to tell her boss.  Defendant held his hand in his pocket in a way that indicated he had a gun.  He said, "Don't make me do this."

Thompson returned to the cash register and opened it.  Defendant reached across the counter and took all of the bills out of the drawer.  This included a stack of 20's with a tracer chip inside planted to allow it to be traced.  Thompson testified that initially she "wasn't scared," "the fear didn't set in," "[i]t's kind of like it shut off and I just became like a robot kind of."  The fear did set in after the robbery.  She went back to the register because she could not dissuade defendant and if she left "something worse may have – may occur."

Elizabeth Bailey was working as a night manager that evening.  She walked up as defendant, his hand in his pocket pointing like he had a gun, was commanding Thompson, who appeared very upset, to return to the cash register.  She thought defendant had a gun and told Thompson to give defendant the money.  She then told the other cashier, Margo Polis, [FN 2] to give defendant her money too.  Bailey was nervous and upset during the incident.  She knew that Thompson's drawer had a planted tracking device.  After defendant took the money from Polis he left.

> [FN 2]  Polis did not tesitfy.  She had died before trial.

Shortly thereafter, Officer James Anderson of the Sacramento County Police Department received a radio message about the robbery indicated that the loot included one or more tracer tags.  His patrol car was equipped to track such tags.  As he drove toward the Rite Aid he began to receive a signal from the tags.  He followed the signal to 29th Avenue, about a mile from the Rite Aid, about 14 minutes after the radio alert.  Other police officers converged on the location.

Officer Mark Chapman was one of them.  He and his patrol dog, Hawk, came to the scene and, about 9:50 p.m., entered a field behind the perimeter of homes along the street.  Within a minute

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District opinion on direct appeal dated February 28, 2008 and filed by Respondent in this Court as Exhibit A to his answer (hereinafter the "Slip Op.")

Hawk located defendant who yelled out his surrender.  He was detained.  A large amount of cash and the tracer tags were found where he had been hiding.

Thompson and Bailey were brought to the scene around 10:30 p.m. Each was admonished that the person they would be shown may or may not be the person who robbed them.  Separated, each identified defendant as the robber.

After his arrest defendant's booking photo was used to prepare a six-person photographic array.  On April 16, 2003, Vilma Gomez and Shawna Roberick were separately shown the photo array, after signing a standard photographic lineup admonition form.  Each identified defendant's photo as of the person who on January 24, 2003, about 4:00 p.m., had robbed them of approximately $400 at the Portrait Solutions studio in the Florin Mall in Sacramento.

On April 30, 2003, a similar array with defendant's photo was shown to Tariq Khan.  Khan was a customer present at an Auto Zone store on Broadway on March 15, 2003, when it was robbed. After a verbal admonition that he was under no obligation to pick anyone and not to guess, Khan identified defendant's photo as most like the robber.  On May 8, 2003, the same array was shown to Adelina Bajramovic, the clerk who was the victim of the Auto Zone robbery.  After a similar admonition, she identified defendant's photo, observing that she remembered him because his face was sunken in.

Defendant was charged with three counts of robbery for the Rite Aid robbery, two such counts for the Portrait Solutions robbery and one such count for the Auto Zone robbery.

*Denial of severance*

Before trial defendant made a motion to sever the Rite Aid counts from the others.  He argued that severance was required because of the disparity in the strength of the evidence as to the charges, to wit, the Rite Aid charges were backed by fresh identification and corroborating physical evidence and the other charges only by evidence of two lineup identifications months after the robberies in issue.  The prosecutor responded that the defense characterization of the Portrait Solutions and Auto Zone cases as "extremely weak" was incorrect and that joinder was appropriate. The trial court denied the motion to sever.

*The verdicts*

Late on the afternoon of the third day of deliberations the jury foreman sent a note to the court asserting:  "We the jurors have verdicts for counts [one], [two], and [three].  We are still deadlocked on counts [four], [five], and [six]."  The jury was

3

1    excused and ordered to return.

2    The next court day, with the agreement of counsel, the jury was
     brought to the courtroom "to take the verdicts on those counts for
3    which they have arrived at verdicts."  The court said that based on
     the note it appeared there were verdicts on some counts.
4    Addressing the presiding juror, the court said, "I see you have an
     envelope, and I assume you brought that to court at the direction of
5    the Court and that is as to the verdict which have been reached in
     this case; is that correct?"  The foreman replied that was correct.

6
     The court then had the clerk read the verdicts aloud, to wit, guilty
7    of robbery on the three counts pertaining to the Rite Aid robbery.
     After the verdict was read on each count, the court asked of the
8    jury, "Is this your verdict?"  And the jurors replied, "Yes."  The
     court then asked if counsel wished to have the jury polled as to
9    their verdicts.  Counsel declined.  The court directed that those
     verdicts be recorded.
10
     After determining by inquiry that further deliberation on the
11   remaining counts would not be productive, the court declared the
     jury deadlocked as to those counts and declared a mistrial as to
12   those counts.

13   (Slip Op. at p. 2-6.)

14       Petitioner appealed to the California Court of Appeal and raised the following claims:  (1)

15   the judgment must be reversed because the court erroneously denied the motion to sever; (2) the

16   judgment must be reversed because the court erroneously failed to exclude identification

17   evidence; (3) the robbery convictions are backed by insufficient evidence and instructions on

18   attempted robbery, a lesser included offense, were wrongly omitted; and (4) the judgment must

19   be reversed because of the improper manner in which the court took the verdicts.  On February

20   28, 2008, the Court of Appeal affirmed the judgment.  Subsequently, the California Court of

21   Appeal denied Petitioner's petition for rehearing on March 21, 2008.

22       Petitioner then filed a petition for review in the California Supreme Court which only

23   raised issues (1) and (2) that Petitioner raised in the California Court of Appeal as described

24   above.  The California Supreme Court summarily denied the petition for review on May 14,

25   2008.

26       In March 2009, Petitioner filed a petition for writ of habeas corpus in the Superior Court

4

1   of California, County of Sacramento.  Petitioner raised the issue of prosecutorial misconduct in

2   that state habeas petition that he raises in his federal habeas petition.  On June 10, 2009, the

3   Superior Court denied the state habeas petition in a written decision.  Subsequently, Petitioner's

4   state habeas petitions to the California Court of Appeal and the California Supreme Court were

5   summarily denied.

6       Petitioner filed his federal habeas petition in June 2010.  Respondent answered the

7   petition in September 2010.  Petitioner filed a traverse in January 2011.

8                   III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

9       An application for writ of habeas corpus by a person in custody under judgment of a state

10  court can only be granted for violations of the Constitution or laws of the United States.  See 28

11  U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

12  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

13  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

14  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

15  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

16  decided on the merits in the state court proceedings unless the state court's adjudication of the

17  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

18  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

19  resulted in a decision that was based on an unreasonable determination of the facts in light of the

20  evidence presented in state court.  See 28 U.S.C. 2254(d).

21      As a threshold matter, a court must "first decide what constitutes 'clearly established

22  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

23  538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

24  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

25  at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

26  application clause, a federal habeas court making the unreasonable application inquiry should ask

5

1   whether the state court's application of clearly established federal law was "objectively

2   unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

3   not issue the writ simply because the court concludes in its independent judgment that the

4   relevant state court decision applied clearly established federal law erroneously or incorrectly.

5   Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

6   law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

7   determining whether a state court decision is an objectively unreasonable application of clearly

8   established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

9   the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

10  applied, we may look for guidance to circuit precedents.").  In this case, the last reasoned

11  decision with respect to Claims I and II was from the Court of Appeal on direct appeal and from

12  the Sacramento County Superior Court on Claim III on Petitioner's state habeas petition.

13                       IV.  ANALYSIS OF PETITIONER'S CLAIMS

14          A.  Claim I

15          In Claim I, Petitioner argues that the field identification by the two Rite Aid employees

16  violated his Constitutional rights because they were unduly suggestive and unnecessary and that

17  the identifications were not reliable.  The Court of Appeal addressed this Claim as follows:

18                  Defendant contends the trial court erred in denying his motion in
                    limine to bar evidence that he was identified by two of the Rite Aid
19                  victims in the field at the place of his arrest.  He argues that the
                    showup was (1) unjustified and (2) unduly suggestive.  The
20                  arguments are unpersuasive.

21                  A.  Justification for Field Identification

22                  Defendant argues that the field identifications should have been
                    suppressed because it was unnecessary to proceed in this fashion.
23                  He submits that there was no exigency, the police were not going
                    to release him, there was no reason to believe anyone else was
24                  involved in the crime, and he could easily have been jailed and a
                    lineup conducted the next day?

25
                    The issue of justification for a field identification arises with
26                  respect to whether an identification is impermissible because of

                                              6

denial of the right to counsel.  "Through good police work, good fortune, or a combination of the two, a criminal suspect may be apprehended so close in proximity to the time and place of the crime itself, the exigencies of the situation and over-riding [*sic*] public policy make it neither practical nor necessary to afford counsel for an in-the-field identification.  It is not necessary to our decision to define the actual limits of time or distance which circumscribe the procedure.  It is sufficient that we be satisfied, as we are, the in-the-field identification in the instant case falls well within those limits."  (People v. Colgain (1969) 276 Cal.App.2d 118, 125-126.)  "[W]e apprehend the rule to be that the presence of counsel is not required at an in-the-field identification made in close proximity to the time and place of the crime itself."  (People v. Rodriguez (1970 10 Cal.App.3d 18, 29.)

The justification question requires a rule-of-thumb approach that can be administered by police officers in the field.  Rather than weighing factors, the rule is categorical:  Is the field show-up close in proximity to the time and place of the crime?  If these criteria are satisfied, it is immaterial that the police have enough evidence to arrest the suspect, or that there is no reason to believe anyone else was involved in the crime, or that he could easily be jailed and a lineup conducted the next day.  (See, e.g., People v. Odom (1980) 108 Cal.App.3d 100, 110.)

Every field identification is inherently suggestive.  "The potential unfairness in such suggestiveness, however, is offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later.  Because the problem is inherent in such confrontations, the choice is between prohibiting all in-the-field identifications or permitting them notwithstanding the element of suggestiveness.  The choice involves a balancing of the interests of fairness to criminally accused persons and prompt, proper and efficient law enforcement, and the choice has properly been made to permit in-the-field identifications, because the immediate knowledge whether or not the correct person has been apprehended is of overriding importance and service to law enforcement, the public and the criminal suspect himself.  (People v. Odom, supra, 108 Cal.App.3d at p. 110.)

The field identification in this case was conducted within 90 minutes of the crime at a nearby location.  This is within the California precedents for authorization of use of this kind of identification procedure.  (See 2 Witkin, Cal. Evidence (4th ed/ 2000; Witnesses, § 303, pp. 702-704 and cases cited therein.)

*B.  Suggestiveness of the Field Identification*

Defendant argues that the field identification in this case was unduly suggestive.  However, the considerations he points to are

essentially those inherent in use of the field show-up procedure. As related above, the case law permitting this procedure generically resolves the police balance between suggestiveness and the competing values served. Defendant is free to attempt to undermine the field show-up identification based on the inherent suggestiveness of the procedure. However, he is not permitted to have it suppressed in the absence of some special and gratuitous significant heightening of this suggestiveness to a particular case. There are no such circumstances in this case and the trial court did not err in denying the motion to suppress this identification.

(Slip Op. at p. 10-13.)

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds by, Griffith v. Kentucky, 479 U.S. 314, 326 (1987). Each case must be considered on its own facts and whether due process has been violated depends on "the totality of the circumstances surrounding the confrontation." Simmons v. United States, 390 U.S. 377, 383 (1968). A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances. See Neil v. Biggers, 409 U.S. 188, 198 (1972). A two-step process is used to determine the constitutionality of a pretrial identification procedure. See United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984) (per curiam).

The first step focuses on whether the procedures used were impermissibly suggestive. See id. An identification procedure is suggestive where it "[i]n effect . . . sa[ys] to the witness, 'This is the man.'" Foster v. California, 394 U.S. 440, 443 (1969). "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. See Stovall, 388 U.S. at 302. However, "the admission of evidence of a showup without more does not violate due process[,]" see Biggers, 409 U.S. at 198, and "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it[.]" Stovall, 388 U.S. at 302 (footnote omitted).

If the flaws in the pretrial identification procedures are not so suggestive as to violate due

1   process, "the reliability of properly admitted eyewitness identification, like the credibility of the

2   other parts of the prosecution's case is a matter for the jury."  See Foster, 394 U.S. at 443, n. 2;

3   see also Manson v. Brathwaite, 432 U.S. 98, 116 (1977) ("[j]uries are not so susceptible that they

4   cannot measure intelligently the weight of identification testimony that has some questionable

5   feature").  On the other hand, if an out-of-court identification is inadmissible due to

6   unconstitutionality, an in-court identification is also inadmissible unless the government

7   establishes that it is reliable by introducing "clear and convincing evidence that the in-court

8   identifications were based upon observations of the suspect other then the lineup identification."

9   United States v. Wade, 388 U.S. 218, 240 (1967).

10         If the identification procedure was impermissibly suggestive, a reviewing court proceeds

11   to the second step and determines whether, under the totality of the circumstances, an

12   identification that resulted from it was nevertheless reliable.  See Biggers, 409 U.S. at 198-99.

13   Factors to be considered in evaluating the reliability of an identification after a suggestive

14   procedure include:  (1) the opportunity of the witness to view the criminal at the time of the

15   crime; (2) the witness's degree of attention paid to the criminal; (3) the accuracy of the witness's

16   prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time

17   of the confrontation; and (5) the length of time between the crime and the confrontation.  See id.

18   at 199-200; Torres v. City of Los Angeles, 548 F.3d 1197, 1209 (9th Cir. 2008).

19         Even assuming *arguendo* that the identification procedure used was suggestive,

20   Thompson and Bailey's identifications of Petitioner were reliable under the circumstances when

21   the factors cited above are analyzed.  First, both Thompson and Bailey had ample opportunity to

22   view Petitioner.  The robbery took place while the Rite Aid was open for business.  With respect

23   to Thompson, she testified that she spoke to the robber and that he was only a few feet from her

24   during the robbery.  (See Reporter's Tr. at p. 257-61.)  Bailey also testified as to the distance the

25   robber was from her when she saw him in the Rite Aid which it was approximated was fourteen

26   to fifteen feet and that she had a pretty good view of the robber.  (See id. at p. 302, 312.)

9

1    Next, Thompson testified that as soon as the individual who robbed the Rite Aid came

2    into the store, she could tell automatically that he was going to target the store for robbery.

3    (See id. at p. 255 ("I knew right away he was going to rob us.").)  Bailey was also aware that the

4    robber was robbing the Rite Aid.  (See id. at p. 301.)

5    Additionally, Bailey gave an in depth description which included that the robber was

6    black, mid-thirties, approximately five feet seven inches tall, approximately 150 pounds wearing

7    a gray hooded sweatshirt."  (Id. at p. 58.)  According to the police report, Thompson stated that

8    the robber was a "[m]ale black adult wearing gray sweatshirt and black pants."  (See Reporter's

9    Tr. at p. 45.)

10    Next, while the degree of certainty that Thompson had on the night of the identification is

11    not revealed in the record, Thompson did not equivocate on her identification of the Petitioner as

12    the robber at trial.  (See id. at p. 268.)  Bailey testified at trial that she was certain at the time of

13    the identification that the individual she was brought to by the police was the robber.  (See id. at

14    p. 315.)

15    When the factors are analyzed under the totality of the circumstances, the identification of

16    Petitioner by Thompson and Bailey was reliable.  Bailey and Thompson had a good look at the

17    robber.  Both knew that the individual was robbing the Rite Aid and the identifications took

18    place within 90 minutes of the robbery.  The issue of the identification was properly left up to the

19    jury to decide and the Petitioner has failed to show that he is entitled to federal habeas relief on

20    Claim I.

21    B.  Claim II

22    In Claim II, Petitioner argues that the trial court erred in denying his motion to sever the

23    robbery charges.  The California Court of Appeal analyzed this Claim as follows:

24         Defendant contends that the trial court erred prejudicially in
           denying the motion to sever and that failure to sever resulted in
25         gross unfairness amounting to a denial of due process of law.  He
           argues the court abused its discretion in failing to require severance
26         because evidence in the Rite Aid case was differentially strong, and

severance would have served the cause of judicial economy.  He argues that the failure to sever resulted in a due process violation because it allowed the prosecutor to misuse evidence that was not cross-admissible.  Defendant's arguments are unpersuasive.

*A.  Error in Denying the Motion to Sever*

When the requirements for joinder are met, [FN 3] as here, the defendant has the burden of making a clear showing of potential prejudice to show error.  (People v. Sandoval (1992) 4 Cal.4th 155, 172.)  Potential prejudice depends on the particular circumstances of each individual case, however, where "certain of the charges are unusually likely to inflame the jury against the defendant" (id. at p. 172) or "a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges" (id. at pp. 172-173), a showing of prejudice can be made out (ibid.).  "[T]he propriety of a ruling on a motion to sever counts is judged by the information available to the court at the time the motion is heard."  (People v. Cummings (1993) 4 Cal.4th 1233, 1284.)

> [FN 3]  Section 954.1 provides:  "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact.

We do not consider defendant's appellate arguments that the Ride Aid robbery was more inflammatory because a gun was used and that judicial economy would likely have been served if the charges were severed.  These arguments were not tendered to the trial court and cannot be raised on appeal for the first time to impugn its ruling.  (See 9 Winkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, p. 444.)

That leaves the question of whether the trial court abused its discretion in failing to find that the Ride Aid incident was a "strong" case and the other two cases were such "weak" cases that joinder might well alter the outcome of some or all of the charges.  The showing made on this point in the severance motion proceedings was sparse.  It did indicate that the overall evidence in the Rite Aid case was quite strong, defendant having, in effect, been caught red-handed.  However, that does not compel the conclusion that evidence in the other cases was so weak as to compel severance.  Evidence on counts can be different in kind and

strength without compelling severance, if it strongly implies guilt in both cases.  (See <u>People v. Bean</u> (1998) 46 Cal.3d 919, 939.)

Based on the showing made to the court on the severance motion, we do not discern an abuse of discretion in the implied finding that the Portrait Solutions case and the Auto Zone case were not sufficiently weak to compel severance.  In each there were two witnesses who separately identified defendant as the robber in a properly conducted photographic lineup.  The claim that the trial court erred in denying the motion is not meritorious.

*B.  Joinder Resulting in a Due Process Violation*

"Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.'  (<u>People v. Arias</u> [(1996)] 13 Cal.4th 92, 127.)" (<u>People v. Mendoza</u> (2000) 24 Cal.4th 130, 162.)  Recent cases have found such unfairness where the prosecutor has urged the jury to draw impermissible inferences based on evidence on another count where that evidence was not cross-admissible.  (See, e.g., <u>People v. Grant</u> (2003) 113 Cal.App.4th 579, 589-590; <u>Bean v. Calderon</u> (1998) 163 F.3d 1073, 1083.)

Defendant argues that is what occurred in this case and that we are therefore constrained to reverse on the ground that joinder resulted in a due process violation.  He points to remarks of the prosecutor in argument in which she asserted:  (1) that defendant "committed a series of robberies"; (2) that in the Rite Aid robbery he was "once again . . . robbing women with his hand under his shirt"; and, lastly, (3) in response to defense counsel's argument that the robbers were different persons because a gun was displayed in the Auto Zone robbery, that the robberies were similar in that the victims were women, the robber was unmasked, and the robber simply announced his purpose and either threatened to use or displayed a gun.

This case is different from those upon which defendant relies.  In this case there is no overt assertion that the jury should infer guilt on one count from evidence on another count.  As noted, the only overt assertion that the method of the robber(s) was similar occurred in response to the defense assertion that the method was dissimilar.

More importantly, if we assume that the evidence was not cross-admissible, then, in our view, urging the jury to draw in impermissible inference should be addressed as an issue of prosecutorial misconduct (cf., e.g., <u>People v. Howard</u> (1994) 25 Cal.App.4th 1660, 1664-1665, disapproved on a different ground in <u>People v. Mosby</u> (2004) 33 Cal.4th 353, 365, fn. 3), rather than

1    as an inevitable "result" of the failure to sever the counts.
     However, in order to preserve for appeal a claim of prosecutorial
2    misconduct, the defense must make a timely objection at trial and
     request an admonition; otherwise, the point is reviewable only if an
3    admonition would not have cured the harm caused by the
     misconduct.  (E.g., <u>People v. Earp</u> (1999) 20 Cal.4th 826, 858.)
4    No objection was made below and in our opinion if the remarks
     were improper, the impropriety could have been cured by an
5    admonition.

6           Accordingly, the claim is not cognizable.

7    (Slip Op. p. 6-10.)

8           Petitioner cites to <u>United States v. Lane</u>, 474 U.S. 438 (1986) in support of Claim II.

9    <u>Lane</u> stated that misjoinder of charges rises to the level of a constitutional violation "if it results

10   in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  <u>Id.</u> at 446

11   n.8.  Petitioner argues that the trial court erred in denying the motion to sever the Ride Aid

12   robbery.  Additionally, Petitioner argues that, "[t]he Auto Zone case was more inflammatory than

13   the Portrait Studios case or the Ride Aid case, because in the Auto Zone case, a gun was used, in

14   the Portrait Studios and Ride Aid cases, no gun was displayed, and, most likely, there was no

15   gun."  (Pet'r's Pet. at p. 11.)

16          Error "involving misjoinder 'affects substantial rights' and requires reversal only if the

17   misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence

18   in determining the jury's verdict.'"  <u>Lane</u> 474 U.S. at 449 (quoting <u>Kotteakos v. United States</u>,

19   328 U.S. 750, 776 (1946)).  Relief is available for improper consolidation only if the

20   "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state trial

21   fundamentally unfair and hence, violative of due process."  <u>Featherstone v. Estelle</u>, 948 F.2d

22   1497, 1503 (9th Cir. 1991) (internal quotation marks and citation omitted); <u>see also</u> <u>Davis v.</u>

23   <u>Woodford</u>, 384 F.3d 628, 638 (9th Cir. 2004) ("The requisite level of prejudice is reached only if

24   the impermissible joinder had a substantial and injurious effect or influence in determining the

25   jury's verdict.") (internal quotation marks and citation omitted).  In evaluating the prejudice

26   suffered by the Petitioner, the focus is "particularly on [the] cross-admissibility of evidence and

1   the danger of 'spillover' from one charge to another, especially where one charge or set of

2   charges is weaker than another." Id.  The reason that there is danger in this situation "is that it is

3   difficult for a jury to compartmentalize the damaging information." Sandoval v. Calderon, 241

4   F.3d 765, 772 (9th Cir. 2000).

5          In this case, the possibility that the jury's passion was inflamed by the introduction of the

6   Rite Aid and/or Auto Zone robbery evidence in one trial is dispelled by the jury's failure to

7   convict Petitioner on counts 4, 5 and 6 which related to the Auto Zone and Portrait Studios

8   robberies.  The Ninth Circuit has "held that the failure of the jury to convict on all counts is the

9   best evidence of the jury's ability to compartmentalize the evidence." Park v. California, 202

10  F.3d 1146, 1150 (9th Cir. 2004) (internal quotation marks and citations omitted).  In this case,

11  the jury did not convict Petitioner on three counts (the charges related to the Auto Zone and

12  Portrait Studios robberies).  This constitutes strong evidence that Petitioner was not prejudiced

13  by the denial of the severance request.  See id. (stating that the jury did not convict petitioner on

14  two counts, which constituted "strong evidence" that petitioner "was not prejudiced by the

15  admission of evidence which was possibly irrelevant with regard to some of the counts").  Had

16  the evidence of the Auto Zone robbery been stronger than the Rite Aid robbery, Petitioner

17  presumably would have been convicted of the Auto Zone robbery.  Petitioner is not entitled to

18  relief on Claim I because he has not shown that the denial of the severance motion had a

19  substantial and injurious effect or influence in determining the jury's verdict on the Rite Aid

20  robbery.[2]

21

22          [2] Respondent argues in his Answer that there is no direct United States Supreme Court
    precedent that clearly establishes that the purported misjoinder of charges in this case offends the
23  United States Constitution.  In Collins v. Runnels, 603 F.3d 1127 (9th Cir. 2010), cert. denied,
    131 S.Ct. 243 (2010), the Ninth Circuit analyzed "whether clearly established Supreme Court
24  precedent binding on the states requires trial severance where a co-defendant presents a mutually
    antagonistic defense." Id. at 1128.  The Ninth Circuit then analyzed Lane and stated the
25  following:

26              Lane dealt with the joinder of standards under Federal Rules of
                Criminal Procedure 8 and 52; no constitutional issue was before

C.  Claim III

In Claim III, Petitioner asserts a claim of prosecutorial misconduct.  Petitioner asserts the following in his federal habeas petition:

> The joinder resulted in a trial that was fundamentally unfair, the joinder led, first of all, to the presentation of "other crimes evidence," evidence of robberies which Thompson thought Petitioner committed at Rite Aid on prior occasions.  [¶]  The joinder of counts enabled the prosecutor to allege in her opening statement that "in the year 2003, the defendant committed a series of robberies in Sacramento."  This statement, calculated to frighten jurors from that county, could not have been made at a trial only on the Rite Aid counts.  [¶]  Joinder led the prosecutor improperly to aggregate evidence of separate cases in her closing argument.

> the Court.  "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to holdings, *as opposed to dicta*, of this Court's decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389  (2000) (emphasis added).  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).  The footnote upon which Collins relies did not set forth the governing legal principle in Lane.  It was merely a comment.

> When the Supreme Court does not purport to interpret any provision of the Constitution, then "[t]hat alone would be enough to defeat a claim that [the] application [of the case] to state-court proceedings is 'clearly established.'"  Early v. Packer, 537 U.S. 3, 10, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).  Here, Lane expressly stated that "[i]mproper joinder does not, in itself, violate the Constitution."  474 U.S. at 446 n.8, 106 S.Ct. 725.  Collins argument that Lane applies to state courts fails for that reason.

Id. at 1132.  Thus, the Ninth Circuit held that Lane did not "establish a constitutional standard binding on the states requiring severance in cases where defendants present mutually antagonistic defenses."  Id. at 1132-33.  This Court need not and declines to reach the issue of whether Lane clearly established that the denial of the severance motion could offend the United States Constitution.  As detailed above, even if Lane did so "clearly establish," Petitioner's claim would still fail on the merits because he failed to show that the purported impermissible joinder of the robberies had a substantial and injurious effect or influence in determining the jury's verdict in ultimately finding Petitioner guilty on the Rite Aid robbery counts.

1    (Pet'r's Pet. at p. 13.)

2         The Superior Court analyzed this Claim in Petitioner's state habeas petition and stated the

3    following:

4              Prosecutorial misconduct merits relief through habeas corpus only
               where the misconduct "so infected the trial with unfairness as to
5              make the resulting conviction a denial of due process." (Greer v.
               Miller (1987) 483 U.S. 756, 765.)  Denial of due process in this
6              context is the equivalent of denial of a fair trial.  (Ibid.)

7              In this case petitioner claims that the prosecutor committed
               misconduct by commenting on evidence that applied to certain
8              counts but not to others.  It is highly unlikely that this action was
               misconduct, but even it if were, it did not deny petitioner a fair
9              trial.  Thus, it merits no relief through habeas.

10   (Lodged Doc. 10 at p. 1.)

11        A criminal defendant's due process rights are violated if prosecutorial misconduct renders

12   a trial "fundamentally unfair."  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing

13   Darden v. Wainright, 477 U.S. 168, 183 (1986)).  A habeas petition will be granted for

14   prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to

15   make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181 (internal

16   quotation marks and citation omitted).  Isolated comments by a prosecutor may be cured by jury

17   instructions.  See Sassounian v. Roe, 230 F.3d 1097, 1106-07 (9th Cir. 2000); see also Hall v.

18   Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were

19   isolated moments in a three day trial.")  A claim of prosecutorial misconduct is analyzed under

20   the prejudice standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Karis v.

21   Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002) (stating that a claim of prosecutorial misconduct

22   is analyzed under the standard set forth in Brecht).  Specifically, the inquiry is whether the

23   prosecutorial misconduct had a substantial and injurious effect on the jury's verdict.  See

24   Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial

25   misconduct because it could not have had a substantial impact on the verdict under Brecht).

26        Additionally, with respect to improper prosecutorial comments during closing arguments,

16

1   the law is settled that under this due process standard, "[c]ounsel are given latitude in the

2   presentation of their closing arguments, and the courts must allow the prosecution to strike hard

3   blows based on the evidence presented and all reasonable inferences therefrom." Ceja v.

4   Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (internal quotation marks omitted).  A reviewing

5   court should consider a prosecutor's allegedly improper statements in light of the realistic nature

6   of trial closing arguments.  "Because 'improvisation frequently results in syntax left imperfect

7   and meaning less than crystal clear,' 'a court should not lightly infer that a prosecutor intends an

8   ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy

9   exhortation, will draw that meaning from the plethora of less damaging interpretations.'"

10  Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416

11  U.S. 637, 647 (1974)).  A challenged or offering statement must also be evaluated in the context

12  of the entire trial, as well as the context in which it was made.  See Boyde v. California, 494 U.S.

13  370, 384-85 (1990).

14          Petitioner first appears to reassert his argument for improper joinder within Claim III.

15  These arguments did not merit federal habeas relief as discussed infra Part IV.B.  Next, Petitioner

16  appears to assert that the prosecutor improperly implied during argument that Petitioner had

17  robbed the Rite Aid on previous occasions before he was caught.  During closing argument the

18  prosecutor stated as follows, "[b]ut she [Thompson] realized on March 6th she had seen him

19  before, although that time she described she thought he had a scarf over his face.  But she

20  recognized him from before, which is why when he came in she said this person was going to rob

21  the store."  (Reporter's Tr. at p. 650.)  Thompson testified that she indicated to police that the

22  person who had just robbed the Rite Aid had previously robbed the Rite Aid.  The following

23  colloquy took place at trial:

24              Q:  Did you indicate that that – that the person who robbed you and
                said, don't make me do this, was the same person who had robbed
25              you when you were working with Adela?
                A:  Yes.
26

17

(Reporter's Tr. at p. 267.)  Based on the foregoing, the prosecutor's statement regarding prior incidents at the Rite Aid did not amount to prosecutorial misconduct, but was instead a permissible inference based on the evidence produced at trial.

Additionally, Petitioner failed to show that the prosecutor's statements had a substantial and injurious effect on the jury's verdict.  The jury was instructed as followed by the trial judge:

> You must decide what the facts are in this case.  You must use only the evidence that was presented in this courtroom.  Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.  [¶]  Nothing that the attorneys say is evidence.  In their opening statements and closing arguments the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence.

(Reporter's Tr. at p. 682-83.)  The jurors are deemed to have followed these instructions regarding the prosecutor's comments during arguments.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Furthermore, the evidence on the charges for which Petitioner was convicted, (the Ride Aid robbery), was very strong.  It included two eyewitnesses.  Both identified Petitioner as the robber only approximately ninety minutes after the robbery occurred.  Substantial cash and the tracer that were taken in the robbery of the Rite Aid were found where the Petitioner was hiding.  (See Reporter's Tr. at p. 431-33.)

Petitioner also appears to argue that the prosecutor committed misconduct by aggregating the other robberies, i.e. the Auto Zone and the Portrait Studios, with the Rite Aid robbery.  The testimony at Petitioner's trial included testimony of these three robberies.  Thus, Petitioner fails to show that the prosecutor committed misconduct through referring to these robberies. Petitioner failed to show that the prosecutor's purported "aggregation" of these three robberies had a substantial and injurious effect on the jury's verdict.  As previously noted, the jury did not convict Petitioner of the Auto Zone and the Portrait Studio robberies.  Finally, it is worth reiterating that the case against the Petitioner for the Ride Aid robberies was strong such that Petitioner failed to show that he is entitled to federal habeas relief on this Claim.

18

1  V.  PETITIONER'S REQUESTS

2  A.  Request for an Evidentiary Hearing

3  Petitioner also requests an evidentiary hearing on his Claims.  A court presented with a

4  request for an evidentiary hearing must first determine whether a factual basis exists in the record

5  to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."

6  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d

7  1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate

8  that he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).

9  To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if

10  true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal

11  quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for

12  the reasons stated in supra Part IV.  Petitioner failed to demonstrate that he has a colorable claim

13  for federal habeas relief.  Moreover, the Supreme Court has recently held that federal habeas

14  review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that

15  adjudicated the claim on the merits" and "that evidence introduced in federal court has no

16  bearing on" such review.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his

17  request will be denied.

18  B.  Access to Law Library

19  In March 2011, Petitioner filed a request for access to the law library (Dkt. No. 29.)

20  Petitioner requests that "the court issue an order allowing me to attend the legal law library here

21  at this facility on a continued PLU status until my case is no longer active."  (Id.)  Petitioner's

22  request will be denied.  "[F]ederal courts ought to afford appropriate deference and flexibility to

23  state officials trying to manage a volatile environment . . . . Such flexibility is especially

24  warranted in the fine-tuning of the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S.

25  472, 482 (1995).  There is no constitutional guarantee to unlimited access to prison libraries.  See

26  Lindquist v. Idaho State Bd. of Corr., 776 F.2d 851, 858 (9th Cir. 1985).  "A prisoner contending

19

that his right of access to the courts was violated because of inadequate access to a law library must establish two things:  First, he must show that the access was so limited as to be unreasonable.  Second, he must show that the inadequate access caused him actual injury, i.e., show a specific instance in which [he] was actually denied access to the courts."  <u>Vandelft v. Moses</u>, 31 F.3d 794, 797 (9th Cir. 1994).  Petitioner fails to show that he was given inadequate access to the law library.  He does not show that his access was so limited to be unreasonable nor does he show that any purported lack of access caused him actual injury.  Petitioner's federal habeas petition and traverse included multiple relevant legal citations that Petitioner asserted supported his Claims.

## VI.  CHANGE OF RESPONDENT

On March 4, 2011, Petitioner filed a notice of change of address.  (Dkt. No. 28.) Petitioner indicated that he is now incarcerated at the Pleasant Valley State Prison.  Because P. D. Brazelton is the individual who now currently has custody of Petitioner at Pleasant State Valley Prison, the caption of this case will be hereby changed to reflect the proper party Respondent.  <u>See</u> Rule 2, Rules Governing Proceedings under 28 U.S.C. § 2254; <u>see also</u>, <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 441 (2004) ("[W]hen the Government moves a habeas petitioner after she properly files a petitioner naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release.").

## VII.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.      Petitioner's request for an evidentiary hearing is DENIED;

2.      Petitioner's request for law library access (Dkt. No. 29) is DENIED; and

3.      The Clerk is ordered to replace R. LOPEZ with P. D. BRAZELTON as the Respondent in this matter;

For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

1   habeas corpus be DENIED.

2       These findings and recommendations are submitted to the United States District Judge

3   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

4   after being served with these findings and recommendations, any party may file written

5   objections with the court and serve a copy on all parties.  Such a document should be captioned

6   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

7   shall be served and filed within seven days after service of the objections.  The parties are

8   advised that failure to file objections within the specified time may waive the right to appeal the

9   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

10  elects to file, Petitioner may address whether a certificate of appealability should issue in the

11  event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules

12  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

13  when it enters a final order adverse to the applicant).

14  DATED:  December 20, 2011

15

16

17                          TIMOTHY J BOMMER
                            UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

21